DGM INVESTMENTS, INC., Plaintiff,

v.

NEW YORK FUTURES EXCHANGE, INC., Board of Trade of the City of New York, Inc., New York Futures Exchange Settlement Committee and its Members Being "Richard Roes" No. 1–10, the New York Clearing Corporation, and "John Does" No. 1–50,

Individually, and as Agents and Representatives of the New York Futures Exchange, Inc., Board of Trade of the City of New York, Inc. and the New York Clearing Corporation, Defendants.

No. 01 Civ. 11602(RWS).

United States District Court,
S.D. New York.

May 27, 2003.

256

Lacher & Lovell–Taylor, New York, NY, By: Michael A. Lacher, Adam J. Rader, for Plaintiff, of counsel.

Cadwalader, Wickersham & Taft, New York, NY, By: Howard R. Hawkins, Jr., Mary Elizabeth Taylor, Edmund R. Schroeder, Troy G. Pieper, for Nybot Defendants, of counsel.

### OPINION

SWEET, District Judge.

The defendants New York Futures Exchange, Inc., Board of Trade of the City of New York, Inc., New York Clearing Corporation, and the New York Futures Exchange Settlement Committee and its Members, except for Norman Eisler (collectively, the "NYBOT Defendants"), have moved under Rules 12(b)(6) and 9(b), Fed. R.Civ.P., to dismiss the amended consolidated complaint of plaintiffs DGM Investments, Inc. ("DGM"), Triumph–Wef Venture LLC, DGM Trading Specialist Fund LLC, Triumph Futures Fund Ltd., Triumph Premier Traders Ltd., and Triumph–MM Venture Ltd. (collectively, "Plaintiffs"). Plaintiffs opposed this motion and moved for discovery. For the reasons set forth below, the NYBOT Defendants' motion is denied for all defendants, but granted as to DGM's claims against them. It is, therefore, unnecessary to rule on Plaintiffs' cross-motion for discovery.

### Prior Proceedings

In December 2001, Plaintiff DGM initially commenced this action for damages sustained as a result of a manipulation of settlement prices. The NYBOT Defendants moved to dismiss this complaint, and their motion was granted on October 17, 2002. On May 13, 2002, while this initial motion to dismiss was pending, other plaintiffs filed a separate action that was stayed, pending decision on the motion to dismiss.

By agreement of the parties, Plaintiffs subsequently consolidated the two actions and filed an amended consolidated complaint (the "Complaint") on December 20, 2002. The NYBOT Defendants then moved to dismiss this new complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) and the doctrine of law of the case. This motion was heard and marked fully submitted on April 9, 2003.

### The Parties

According to the Complaint, plaintiff DGM is a Nevada corporation that "operated a fund" that engaged in commodity transactions. (Compl.¶3.) It was the Gen-

eral Partner and/or Managing Member of the remaining Plaintiffs. *Id.*

Defendant Board of Trade of the City of New York, Inc. ("NYBOT") is a New York not-for-profit corporation. (Compl. ¶ 11.) NYBOT is the ultimate parent company of defendant New York Clearing Corporation ("NYCC") and defendant New York Futures Exchange, Inc. ("NYFE"). (Compl.¶ 14.) Defendant NYFE, a New York corporation, is a futures and options exchange designated by the U.S. Commodity Futures Trading Commission (the "CFTC") as a contract market for the trading of various commodity futures and options, including the Pacific Stock Exchange Technology Index Futures Contracts and Options ("P–Tech Futures and Options"). (Compl.¶¶ 10, 17.) Defendant NYCC, a New York corporation is the designated clearinghouse of NYBOT's exchange markets, including NYFE. (Compl.¶¶ 18, 32.) The New York Futures Exchange Settlement Committee ("Settlement Committee") was made up of individuals appointed by NYFE and was responsible for calculating settlement prices of the P–Tech Futures and Options contracts. (Compl.¶ 12.) During the period relevant to the Complaint, Norman Eisler ("Eisler") was the Chairman of NYFE and the Settlement Committee. *Id.*

### The Complaint

According to the Complaint, on or about April 1996, NYFE opened trading in P–Tech Futures and Options contracts. The P–Tech Futures and Options were based on a composite index of 100 technology stocks compiled by the Pacific Stock Exchange. (Compl.¶ 17.) The Complaint alleges that for at least August 1999 through on or about May 15, 2000, Eisler, the Settlement Committee, and NYFE manipulated the market by periodically setting the settlement prices for transactions in options on the P-tech Futures contract

market at an artificial level in order to benefit themselves and others. (Compl.¶ 23.) Eisler created these artificial settlement prices while acting for the NYBOT Defendants in his capacity as their agent. (Compl.¶¶ 30, 49, 55–56.)

The NYBOT Defendants, through their Directors and Officers and members, both had knowledge of the price manipulation and, with reckless disregard of their obligations, avoided acquiring such knowledge. (Compl.¶¶ 42–44, 61, 76.) At least six board members of NYFE and, upon information and belief, board members of the other defendants, traded the P–Tech for their own accounts or an account controlled by one or more of them. They thus had a personal interest in the P–Tech Futures Options contract market. (Compl. ¶¶ 62, 79; Goodwin Aff.)

The NYBOT Defendants concealed the systematic and fraudulent manipulation of settlement prices of P–Tech futures and options. (Compl.¶ 41.) They did this in bad faith and for ulterior motives. They hoped to avoid condemnation and exposure by the New York Clearing Corporation ("NYCC"), which would have to assess the other members of NYBOT for the shortfall in Eisler's and others' accounts, and they hoped to perpetuate themselves in office. (Compl.¶¶ 63–64, 80–81.)

NYFE became aware of complaints about false settlement prices, but it failed to take any action to end the manipulation and to enforce NYFE rules governing methods used to settle P-tech Option contract prices. (Compl.¶ 27.) Specifically, the Complaint alleges that the NYBOT Defendants failed to enforce NYFE Rule 315 adequately, which regulates the determination of settlement prices. *Id.*

The manipulation of settlement prices resulted in margin calls on Plaintiffs' accounts and caused DGM to lose its capital

and to wind up its affairs. (Compl.¶¶ 33–36.)

Plaintiffs bring claims against the NY-BOT Defendants for:

1) bad faith manipulation of market prices and violation of NYFE Rule 315 in violation of the CEA (Compl. at 13),

2) bad faith cover-up of manipulation of market prices in violation of the CEA (Compl. at 16),

3) bad faith failure to maintain a stable and objective contract market and bad faith failure to enforce NYFE Rule 315 in violation of the CEA (Compl. at 18),

4) fraud, false reporting and deception in violation of the CEA (Compl. at 22),

5) gross negligence and bad faith (Compl. at 23)

6) *respondeat superior* (Compl. at 24)

### The Rule 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002) (*citing Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 235–236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.2000).

### Bad Faith Requirement

#### 1. Standard

The NYBOT Defendants have moved to dismiss the first four causes of action based upon the failure of DGM to allege bad faith adequately. To bring a claim under the provisions of the CEA, Plaintiffs must allege facts showing that the NYBOT Defendants acted in bad faith. Section 22(b) of the CEA, 7 U.S.C. § 25(b)(4) provides:

> A person seeking to enforce liability under this section must establish that the registered entity registered futures association, officer, director, governor, committee member, or employee acted in bad faith in failing to take action or in taking such action as was then taken, and that such failure or action caused the loss.

*See also Western Capital Design, LLC v. New York Mercantile Exch.*, 180 F.Supp.2d 438, 441 (S.D.N.Y.2001) ("Bad faith is a necessary element to sustain a private right of action against an exchange under the CEA.... This requirement is strictly applied.").

As previously noted in *DGM Invs., Inc. v. New York Futures Exch., Inc.*, No. 01 Civ. 11602, 2002 WL 31356362, at *3 (S.D.N.Y. Oct.17, 2002) and *Western Capital*, 180 F.Supp.2d at 441:

> Bad faith requires wrongful knowledge, and failure to act on that knowledge with a motive ascribable to malfeasance. '[S]elf-interest or other ulterior motive unrelated to proper regulatory concerns must constitute the sole or dominant reason for the exchange action or inaction.' *Minpeco, S.A. v. Hunt*, 693 F.Supp. 58, 61 (S.D.N.Y.1988) (citation omitted). "[T]o succeed on a claim of bad faith, plaintiffs must establish 'first, that the exchange acted or failed to act with knowledge [ ] and second, that the

exchange's action or inaction was the result of an ulterior motive.'" *Id.* (quoting *Ryder Energy Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 780 (2d Cir.1984). Although irrational or arbitrary behavior in some circumstances may support an inference of bad faith the behavior has to be 'so arbitrary' as to justify an inference of 'constructive bad faith.' *Minpeco,* 693 F.Supp. at 63); *see also Brawer v. Options Clearing Corp.,* 807 F.2d 297, 303 n. 9 (2d Cir.1986) ("We do not mean to foreclose the possibility that [exchange actions] might be so arbitrary as to constitute constructive bad faith."), *cert. denied,* 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987).

### 2. *Allegations*

The Plaintiffs' Complaint alleges a bad faith cover-up of the manipulation by the NYBOT Defendants and failure to take corrective action. (Compl.¶¶ 41, 43.) Plaintiffs further point out that NYFE failed to enforce its own rules concerning procedures relating to the regulation of settlement prices, specifically NYFE Rule 315. (Compl.¶ 27.)

#### a. *Knowledge*

■ Plaintiffs claim that the NYBOT Defendants "either knew of the price manipulation, or with reckless disregard of their obligations consciously avoided acquiring such knowledge." (Compl.¶ 43.) To substantiate this contention they point to the following:

a. Upon information and belief, Jeffrey Soman was aware of the manipulation on the day the first margin call was issued to DGM's funds in his capacity as a member of the Board of Directors of NYFE.

b. Defendants received complaints constantly, virtually daily, once it had been discovered by market participants that the settlement prices had been manipulated and were incorrect.

c. In addition, the defendants knew about the price manipulation because it is impossible for an underlying market to move in one direction and have both puts and calls move in that same direction, as they were doing during the relevant time period. This placed defendants on notice of the price manipulation daily.

(Compl.¶¶ 61, 76.) These allegations adequately present a showing of knowledge by the Defendants.

#### b. **Ulterior Motive**

■ First, Plaintiffs argue that a willful disregard of information concerning manipulation is adequate to show bad faith. This Court has repeatedly rejected this argument. *E.g., Western Capital,* 180 F.Supp.2d at 442 (holding that alleging an exchange's "gross indifference to enforcing its floor rules governing outside trading" did not sufficiently establish bad faith); *Vitanza v. Board of Trade of New York,* No. 00 Civ. 7393, 2002 WL 424699, at *1 (S.D.N.Y. Mar.18, 2002) (rejecting the contention that defendants' "irrational indifference to the discrepancies [in settlement prices] was tantamount to bad faith"); *DGM Invs.,* 2002 WL 31356362, at *3. This is the case as "apparent inaction need not be explained by bad faith alone but instead, may be a result of negligent indifference." *Vitanza,* 2002 WL 424699, at *7; *see also Western Capital,* 180 F.Supp.2d at 442 (reasoning that an exchange's failure to enforce rules may be due to "negligent inattention"). Thus, to succeed Plaintiffs must assert that "self-interest or personal animus motivated" the Defendants. *Vitanza,* 2002 WL 424699, at *7.

Plaintiffs further allege that financial interests motivated the NYBOT Defendants to cover-up manipulation and avoid enforcing corrective measures. They claim that "the controlling board members of each Defendant had a personal interest in the P–Tech Futures Options contracts market, as well as in the success of the market." (Compl.¶¶ 62, 79.) Defendants concede that six board members of NYFE traded the P–Tech for their own accounts or an account they controlled in the period from August 1999 to May 2000 (Goodwin Aff.), and, upon information and belief, Plaintiffs maintain that board members of the other defendants did also. (Pls.' Opp. Mem. at 4–5). Thus, here, unlike in the initial complaint, there is an "allegation of personal profiting, ... or payoff, or secret motive outside the parameters of the duties imposed upon the NYBOT Defendants." *DGM Invs.*, 2002 WL 31356362, at *3. This also differs from *Vitanza* where "the Complaint [was] devoid of factual allegations that any of the NYBOT Defendants even traded in the P–Tech or in any way stood to benefit" from the manipulation. 2002 WL 424699, at *6.

Although Plaintiffs assert that controlling board members of each defendant had a personal interest in the P–Tech Futures market on "information and belief," these allegations go beyond mere speculation and conclusory statements. Plaintiffs' contentions are unlike the "conclusory language" in *Vitanza*, where the Complaint stated that the "defendants' dominant and decisive motivation and intent was to advance the defendants' individual and/or corporate self-interest and/or to derive direct personal gain, rather than to advance the public interest all of which was in bad faith." 2002 WL 424699, at *7 (quoting Plaintiff's complaint). This statement hardly says anything and merely parrots the legal standard. This case also differs from *Western Capital*, where plaintiffs speculated that "unnamed officers or directors" of an exchange "failed to prevent outside trades due to a bad-faith desire to profit from them as floor traders." 180 F.Supp.2d at 442. First, these officers could not be traders under the floor rules, and second, Plaintiffs did not even allege that these "officers controlled [the exchange] or influenced its conduct." *Id.* Plaintiffs' Complaint here is also distinguishable from that in *Rose*, where the plaintiff had done "nothing more than to paraphrase relevant legal standards and assert, on information and belief, that she has been discriminated against," *Rose v. Goldman, Sachs & Co., Inc.*, 163 F.Supp.2d 238, 242 (S.D.N.Y.2001), and *D.R.*, where "core averments of the Complaint ... [were] crafted in largely conclusory language," *D.R. v. Bedford Bd. of Educ.*, 926 F.Supp. 47, 49 (S.D.N.Y.1996).

Here, the NYBOT Defendants concede that six board members of NYFE traded the P–Tech for their own accounts. That, in conjunction with Plaintiff's allegation of knowledge of manipulation by the NYBOT Defendants, makes it likely that more than mere negligence and inattention took place. Plaintiffs are thus entitled to discovery to substantiate their claims. As held by *Sam Wong*, "[h]aving shown some financial interest ... [plaintiff] should not be precluded from probing this further ...; he is entitled to limited discovery as to just what interests the defendants had and as to what actually occurred ..., however unlikely it is that this probing will be fruitful." *Sam Wong & Son, Inc. v. New York Mercantile Exch.*, 735 F.2d 653, 678 (2d Cir.1984).[1] Thus, "when self-interest

---

1. *Sam Wong* further advised, "Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify

or other ulterior motive unrelated to proper regulatory concerns is alleged to constitute the sole or the dominant reason for the exchange action, a complaint is sufficient even though the action was not beyond the bounds of reason." *Id.* at 677; *Michelson v. Merrill Lynch Pierce, Fenner & Smith, Inc.,* 619 F.Supp. 727, 736 (S.D.N.Y.1985) (same).

Plaintiffs additionally assert that besides the NYBOT Defendants' financial interest in the market, individual members were also motivated by a self-interested desire to keep their jobs, perpetuate themselves in office, and avoid condemnation for failure to carry out their duties and obligations. (Compl.¶¶ 63, 80.) As previously held, these allegations "do not rise to the level of arbitrary or irrational behavior sufficient to support an inference of bad faith" since the "inference of negligent inattention is equally compelling." *DGM Invs.,* 2002 WL 31356362, at *3.

### 3. *Eisler as Agent*

Plaintiffs further argue that Eisler's bad faith should be attributed to the NYBOT Defendants under agency principles. Under 7 U.S.C. § 2(a)(1)(B):

> The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual association, partnership, corporation, or trust, as well of such official, agent, or other person.

The New York Court of Appeals further explained, "The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it." *Benjamin Ctr. v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 488 N.E.2d 828 (1985). In this way, even if the NYBOT Defendants never participated or even knew about Eisler's acts, they are strictly liable for them as long as Eisler served as their agent.

■ The Complaint alleges that Eisler acted within the scope of his duties and position as Chairman of NYFE and NYFE's Settlement Committee, when he intentionally created artificial settlement prices and purposely disregarded the appropriate settlement procedures set forth in NYFE Rule 315 in order to benefit accounts controlled by him and others. (Compl.¶¶ 49, 51.) Thus, as an agent of NYFE and the Settlement Committee, Eisler's bad faith is attributable to them.

Plaintiffs, however, do not allege any relationship between Eisler and NYFE's affiliates, NYBOT and NYCC, and other individual NYBOT Defendants. Thus, Eisler's conduct can only be imputed to NYFE and the Settlement Committee.

■ The "adverse interest" exception to agency liability is inapplicable here. This exception does not apply "when the agent acts both for himself and for the principal." *In re Crazy Eddie Securities Litig.,* 802 F.Supp. 804, 817 (E.D.N.Y.1992). As explained in the *Crazy Eddie* case, "If the fraud committed by ... top officers was on behalf of the corporation, their knowledge and actions are deemed those of the corporation. The corporation may not escape responsibility for a fraud the primary cost of which was borne not by the stockholders but by outsiders." *Id.*

his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." *Id.* at 671 n. 27.

### Standing

■ CEA § 22(b) expressly provides that CEA private remedies are available only to private litigants who "engaged in any transaction on or subject to the rules" of such contract markets or licensed boards of trade. 7 U.S.C. § 25(b)(1)-(3). Thus, only a purchaser or seller on the contract market has a right of action. *DGM Invs.*, 2002 WL 31356362, at *4; *American Agric. Movement, Inc. v. Bd. of Trade of Chicago*, 977 F.2d 1147, 1153 (7th Cir.1992) ("By its terms, then, § 22(b) creates the exclusive remedies available to those injured by violations of the CEA, and makes those remedies available only to persons injured in the course of trading on a contract market. It therefore forecloses all other remedies, including any on behalf of non-traders.").

■ Plaintiffs, Triumph–Wef Venture LLC, DGM Trading Specialist Fund LLC, Triumph Futures Fund Ltd., Triumph Premier Traders Ltd., and Triumph–MM Venture Ltd., have standing to bring this action as they were funds, which "bought and sold P–Tech Futures Options contracts and traded on and pursuant to the rules" of NYFE. (Compl.¶¶ 4–9.) These Plaintiffs sufficiently plead losses sustained when having to meet uncalled for margin calls as a result of the artificial settlement prices. (Compl. ¶ 35; aff. of James Moore.)

■ However, there is no allegation that DGM bought or sold on the exchange. According to the Complaint, DGM "operated" a fund that traded P–Tech Futures and Options, and "[d]uring all times relevant to this Complaint, DGM was the General Partner and/or Managing Member" of the other Plaintiffs. (Compl.¶ 3.) As already held, the statute confers standing on the actual trader, the fund, not on the corporation that operates it. *DGM Invs.*, 2002 WL 31356362, at *4.

### Plaintiffs' Fraud Claim

■ Plaintiffs' fraud claim under CEA § 4b, 7 U.S.C. § 6b, is proper. Fraud claims under the CEA are not limited to broker/customer relationships. As the Supreme Court held, "The antifraud provision, § 4b, 7 U.S.C. § 6b, by its terms makes it unlawful for any person to deceive or defraud any other person in connection with any futures contract." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 389, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1981). The Court then concluded that "exchanges can be held accountable for breaching their statutory duties to enforce their own rules prohibiting price manipulation ... by futures traders who can prove injury from these violations." *Id.* at 394, 102 S.Ct. 1825.

Furthermore, Plaintiffs have pled fraud with sufficient particularity against the NYBOT Defendants, as required by Fed. R.Civ.P. 9(b). *Modern Settings, Inc. v. Prudential–Bache Sec., Inc.*, 602 F.Supp. 511, 513 (S.D.N.Y.1984).

■ Plaintiffs have adequately alleged scienter, a necessary element of Plaintiffs' fraud-based § 4b claim. *Karasyk v. Marc Commodities Corp.*, 770 F.Supp. 824, 829–31 (S.D.N.Y.1991). The Second Circuit has held that plaintiff can establish scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000). Plaintiffs' Complaint establishes both: (a) motive and opportunity to commit fraud (Compl.¶¶ 42, 62–65, 79–82), and (b) strong circumstantial evidence of conscious misbehavior or recklessness (Compl.¶¶ 27, 42–44, 60–61, 74–78). Plaintiffs allege that the NYBOT

Defendants had a financial interest in covering up the manipulation, and although they had knowledge of the manipulation, they failed to enforce NYFE Rule 315 and take affirmative steps to cure the problem. The Complaint thus alleges "a sufficient factual basis to support an inference of scienter," and the factual allegations "give rise to a 'strong inference' that the defendants possessed the requisite fraudulent intent." *Grunwald v. Bornfreund,* 668 F.Supp. 128, 130–31 (E.D.N.Y.1987) (*quoting Beck v. Mfrs. Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987)).

 It is true that Complaint does not separately allege fraud with particularity as against each of the NYBOT Defendants. "In actions involving multiple defendants, Rule 9(b) requires the plaintiff to plead facts from which fraud may be reasonably inferred as to each defendant. However, pleading requirements may be relaxed when the information is exclusively within the defendant's knowledge as long as the factual basis for allegations based upon information and belief are adequately set forth." *Grunwald,* 668 F.Supp. at 131 (citations omitted). In this case, many of the specifics of the fraud which took place, such as time, place, and steps taken to cover the fraud, are within the sole knowledge of the NYBOT Defendants. Dismissal on the ground that facts within Defendants' knowledge have not yet been proven in the pleading stage is "particularly inappropriate." *Sam Wong,* 735 F.2d at 678.

### Preemption of State Law Claims

As previously held, Plaintiffs' state law claims for gross negligence and bad faith and *respondeat superior* are preempted by the CEA. As explained, "state law claims alleged by plaintiff here would 'directly affect trading on or the operation of a futures market.... These are matters for uniform federal regulation subject to review by the CFTC, not matters for review or adjudication by individual state courts.'" *DGM Invs.,* 2002 WL 31356362, at *5 (*quoting American Agric. Movement,* 977 F.2d at 1156).

### Conclusion

The motion to dismiss the Complaint is denied, but granted as to DGM's claims against the NYBOT Defendants.

It is so ordered.